# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA
### NEW ORLEANS

| | |
|---|---|
| THOMAS D. TURNER | CIVIL ACTION NO. 03-2742 c/w 05-2668 |
| VERSUS | JUDGE DONALD E. WALTER |
| KANSAS CITY SOUTHERN RAILWAY COMPANY | MAGISTRATE JUDGE WILKINSON |

## MEMORANDUM RULING

Before this Court is a Motion for Summary Judgment [Record Document 157], filed on

behalf of defendant, Kansas City Southern Railway Company. For the following reasons,

defendant's motion is **GRANTED.**

## I.      FACTUAL BACKGROUND

Thomas Turner, Jesse Frank, Clarence Cargo, Lester Thomas, and Roberta Brown

("Plaintiffs") are, or were at one time, employed by Kansas City Southern Railway Company

("KCS"). Each of the Plaintiffs were terminated or suspended from employment after allegedly

violating KCS policies. The Equal Employment Opportunity Commission ("EEOC") filed a

complaint on their behalf asserting the Plaintiffs were discriminated and/or retaliated against on

the basis of their race (African American). [No. 05-2668, Rec. Doc. 4].[1] KCS has filed a motion

for summary judgment requesting judgment be granted in its favor as a matter of law. [Rec. Doc.

157].

---

[1]Prior to the filing of the EEOC's complaint, Thomas Turner filed a separate complaint against KCS alleging racial discrimination. [Rec. Doc. 1]. On July 25, 2006, the Court entered an order consolidating the lawsuits brought by Turner and the EEOC. [Rec. Doc. 34].

## A.    Thomas Turner

On October 1, 2002, Thomas Turner ("Turner"), a locomotive engineer, was involved in an incident in which a train derailed causing damage to several train cars. Thomas Schmitt ("Schmitt"), a white conductor, was on the ground providing instructions to Turner regarding how much space Turner had left before the end of the spur track. A formal investigative hearing was held on October 15, 2002 to determine the responsibility of each individual for the incident. [EEOC Ex. 3]. At the hearing, Turner argued Schmitt was entirely at fault because he provided improper signals, while Schmitt argued he provided the correct signals but Turner failed to appropriately respond to those signals. *Id.* After conducting the hearing, Paul Lobello, the investigating officer, determined Turner violated numerous KCS Operating Rules in the derailment incident. [KCS Ex. A2; Lobello depo. p.116-130]. Consequently, as a result of the October 1, 2002 incident and his prior disciplinary history,[2] Turner was discharged. [ KCS Exs. A2, 7, 8].

Pursuant to the collective bargaining agreement ("CBA") between the Brotherhood of Locomotive Engineers and KCS, Turner's union representative appealed his dismissal to Denise L. Brame ("Brame"), Manager of Labor Relations for KCS. Brame, who is also African American, found the "discipline issued in this case was fully warranted and clearly supported by the facts adduced at the formal investigation" and denied Turner's appeal. [KCS Ex. A7]. This decision was then appealed to Kathleen Alexander ("Alexander"), Director of KCS's Labor

---

[2]Turner's disciplinary history revealed a 1974 drug test showing the presence of long-lasting barbiturates, a written reprimand for deficient train inspections in 1982, a suspension for a failed brake test in 1988, and a "last chance" reinstatement following his dismissal due to a failed drug and alcohol test in 1999. [KCS Exs. A4-6, 11].

Relations Department. Alexander also determined Turner was guilty of the rule violations and denied his appeal. [KCS Ex. A8]. Following the last step of the grievance process provided for in the CBA, Turner and his union representative appealed his dismissal to the Public Law Board, a disciplinary review body comprised of one union representative, one carrier representative, and a neutral arbitrator. On January 19, 2004, the Public Law Board issued written findings stating that "shoving the disabled engine over a derail can be attributed to [Turner's] negligence in not following the rules," and that there was "sufficient evidence" to establish Turner's culpability for the charges assessed. [KCS Ex. A11]. Nonetheless, the Public Law Board converted his dismissal to a long suspension, and ordered that he be reinstated without back pay. *Id.* Following this decision, Turner was reinstated by KCS and remained employed there until his recent retirement.

## B. Jesse Frank

Pursuant to KCS policy, when an employee would like to request time off, the employee is required to call the crew dispatch office and request to be "marked off" for a certain shift for a particular reason, such as sick leave, family emergency, or personal reasons. [KCS Ex. A ¶10]. Unless the employee is sick, the employee's request to be "marked off" will be granted only if KCS has enough available employees on the "extra board" to fill in for the absent employee. If there is no one on the extra board to run the train, the request for leave is denied by the crew dispatcher unless higher-level managerial personnel specifically allow it. *Id.* ¶ 11.

On December 28, 2002, at the end of his morning shift, Jesse Frank ("Frank") informed his supervisors, Paul Seghers and Lane Bonds, that he had a family emergency and needed to take off work for his next shift, which was scheduled to start at 10:00 p.m. Seghers and Bonds

informed him that he would need to call the crew dispatcher to request time off because they did not have the authority to do so. [EEOC Ex. 6].  At 4:30 p.m., less than six hours before his next shift was scheduled to begin, Frank called the crew dispatcher, Michelle Holmes, to request time off and implied that his request had already been authorized by Seghers and Bonds. [KCS Ex. D; EEOC Ex. 6].  Because there were no extra employees available to work on Frank's shift and run the train to which he was assigned, Holmes contacted Seghers and Bonds to verify whether Frank's request had been authorized.  When they confirmed that they had not authorized the time off, Holmes informed Frank that there was no one available to replace him and that she could not mark him off.  [KCS Ex. D].  At that time, Frank was already several hours away from New Orleans and responded that he would not appear for his shift. [KCS Exs. A18, D.]

On January 27, 2003, an investigative hearing was held to determine Frank's responsibility in connection with his failure to appear at work, also known as a "missed call." [EEOC Ex. 6].  Paul Lobello, the investigating officer, determined Frank violated KCS Operating Rules and was dishonest in his attempt to get time off.  [EEOC Ex. 6; KCS Ex. A12; Lobello depo. p.82-83].  As a result of Frank's violations and the 13 prior disciplinary actions he received between 1985 and 1999 (including repeated violations for "missed calls") [KCS Ex. A14], KCS suspended Frank for 90 days without pay. [KCS Ex. A12].

Frank appealed his suspension to Denise Brame, who found the discipline was justified and denied his appeal. [KCS Ex. A16].  Kathleen Alexander also denied his appeal, noting Frank admitted that no one granted him the authority to be off on December 28, 2002, and that his discipline was clearly justified in light of his substantial disciplinary history. [KCS Ex. A17].

The Public Law Board also found Frank at fault,[3] but determined the 90 day suspension should be reduced to 45 days. [KCS Ex. A18].

## C.  Lester Thomas

On February 14, 2004, Lester Thomas ("Thomas") and Joshua Hall ("Hall"), white engineer, were on a train which ran past a "dark signal"[4] during a training exercising. An investigative hearing was held and it was determined that Thomas was at fault in failing to stop the train and failing to properly update his "train consist,"[5] failures which violated KCS Operating Rules and Federal Railroad Administration regulations. [KCS Ex. A19]. Both Thomas and Hall were fired by KCS, though Hall was reinstated after serving a 30-day suspension.

Thomas appealed his dismissal contending Hall was entirely at fault for the incident and that even if Thomas was partly to blame, there was no reason for him to be punished more severely than Hall. KCS claims the differential treatment was justified because Thomas had nine prior disciplinary actions while Hall had only four prior disciplinary actions. [KCS Ex. A20; Rec. Doc. 116, A52]. During the pendency of the grievance process, KCS offered Thomas leniency reinstatement,[6] without back pay, but with his seniority and vacation rights unimpaired. [KCS

---

[3]In its findings, the Public Law Board stated: "There is really no controversy about [Frank] missing a call. He may have had a family emergency, but he readily admits that no one gave him authority to be off." [KCS Ex. A18].

[4]A train is required to stop a certain distance from a warning signal that is not lighted ("dark signal") because the "dark signal" may indicate signal malfunction.

[5]A "train consist" is a document specifying the position of every car on the train.

[6]On November 9, 2004, KCS offered Thomas a leniency reinstatement on a last chance basis with a two-year probationary period. Thomas rejected the offer because of the probationary period. On January 24, 2005, KCS offered Thomas another leniency reinstatement without the last chance provision and two-year probationary period, which Thomas accepted. [KCS Ex.

Ex. A21]. Thomas accepted this offer and agreed to withdraw any and all claims he had against KCS.[7] *Id.*

### D.     Clarence Cargo

On May 28, 2003, Clarence Cargo ("Cargo") was suspended for failing to provide a faxed confirmation of a work order on May 1, 2003. [KCS Ex. A22]. Cargo had 16 prior disciplinary actions against him from 1986 and 2003. [KCS Ex. A23]. In 2002 and 2003 alone, prior to the May 1, 2003 incident, Cargo received a written reprimand for failing to fax a work order on December 13, 2002; a 15 day suspension for failing to fax a work order on January 30, 2003; a 5 day record suspension for failure to be available on December 8, 2002; a letter of reprimand for failure to void a DTC form on January 27, 2003; a 15 day actual suspension and 15 day deferred suspension for failure to properly inspect his train on January 27, 2003; and a 15 day suspension and a 15 day deferred suspension for failure to provide proper cover on a hazardous car on January 30, 2003. *Id.* These incidents were the subject of the Charge of Discrimination filed with the EEOC by Cargo on April 2, 2003, wherein he alleged he was being discriminated

---

A21].

[7]Prior to accepting reinstatement, Thomas filed a Charge of Discrimination with the EEOC on May 17, 2004. The EEOC filed suit on behalf of Thomas on June 29, 2005, after Thomas accepted the reinstatement and agreed to settle all claims against KCS. On April 9, 2009, the EEOC withdrew their claims for monetary damages on behalf of Lester Thomas, but the EEOC reserved "all of its other rights, including but not limited to proof of Defendant's violation of Lester Thomas's rights, proof of all relevant circumstances concerning Lester Thomas's employment with and termination by KCS, and seeking appropriate injunctive or other non-monetary relief in connection with Defendant's violation of Lester Thomas's rights." [Rec. Doc. 217]. *See EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539 (9th Cir. 1987) (an employee's settlement does not moot the EEOC's right of action seeking injunctive relief to protect employees as a class and to deter the employer from discrimination).

against on the basis of his race.[8]  [EEOC Ex. 61].

With respect to the May 1, 2003 incident, Cargo waived his right to a formal investigative hearing and accepted responsibility. [KCS Ex. A22].  KCS suspended Cargo for 30 days in connection with the May 1, 2003 incident itself and activated the 15 day deferred suspension he previously received, for a total of 45 days suspension.  *Id.*

On January 7, 2004, a KCS train on which Cargo was the conductor and Scott Claiborne (white) was the engineer passed through an improperly lined switch and derailed ("switch incident"), causing track and equipment damage. [KCS Ex. A28].  An investigative hearing was held and Cargo was found to have violated several KCS Operating Rules. [KCS Ex. A25; Laughlin depo. p. 45].  As a result, KCS discharged Cargo on January 23, 2004.

Cargo appealed his dismissal to Denise Brame and Kathleen Alexander.  Both Brame and Alexander reviewed the transcript from the hearing and Cargo's prior disciplinary history and determined his dismissal was justified. [KCS Exs. A26-27].  Cargo then appealed his decision to the National Railroad Adjustment Board ("NRAB"), an agency created by the Railroad Labor Act to resolve minor disputes and grievances.  The NRAB also found Cargo violated numerous regulations during the switch incident and expressly rejected his contention that the discipline was "discriminatory and unreasonable." [KCS Ex. A28].  Nonetheless, the NRAB considered Cargo's 31-year employment with KCS[9] and ordered that he be reinstated without back pay.  *Id.*

---

[8]These disciplinary actions are not at issue in this case, except to the extent Cargo alleges the May 1, 2003 suspension and his subsequent discharge were in retaliation for filing the Charge of Discrimination.

[9]The NRAB did "not entirely disagree with the penalty assessed" against Cargo, but found permanent dismissal was excessive given his "long tenure with the Carrier." [KCS Ex. A28].

## E.    Roberta Brown

On October 10, 2003, Reggie Taylor, a fellow employee, called the crew dispatch office on the yardmaster's line[10] and spoke to crew dispatcher Roberta Brown ("Brown"). During the conversation, Taylor stated that he needed to be "marked off." [EEOC Ex. 11]. Although he revealed he would be taking time off to do personal errands, Brown told Taylor "I got you covered" and marked him off as being sick ("Taylor incident"). *Id*, p. 9.

Separately, on September 18, 2003, James Smith, a manager in the crew dispatcher department, received an email concerning the difficulty train crew members were having getting crew dispatchers to answer the phones. [KCS Ex. A31]. Joe McDonald, one of Brown's supervisors, began auditing the crew dispatchers' conversations and listening to those calls that were abnormally long. McDonald found numerous phone calls were occurring between Brown and another crew dispatcher, Gloria Marshall, while Brown was at work and Marshall was at home. On October 27, 2003, notice was sent to Brown informing her of an investigation concerning her alleged failure to devote herself to her duties, failure to follow her supervisor's instructions, and her inappropriate use of company equipment. [KCS Ex. A32]. On October 30, 2003, three days after Brown was notified of her pending disciplinary hearing, Brown sent a letter to Rich Venditti in Human Resources, complaining of "favoritism" in the crew dispatcher department. [KCS Ex. A33]. Brown specifically referred to three employees whom she felt were

---

[10]The yardmaster's line is reserved for specific types of calls from conductors. Taylor was not a conductor on duty and was not authorized to call the yardmaster's line to request time off.

being favored, two of whom were African American employees.[11]

On November 26, 2003, following an investigative hearing concerning the Taylor incident, KCS suspended Brown for 30 days and Taylor for 10 days. [KCS Ex. A29]. Pursuant to the grievance procedures, Brown and her union representative appealed her suspension. John Morse, Director of Labor Relations at that time, reviewed the transcript of the phone call between Taylor and Brown, the transcript of the formal hearing, and Brown's prior disciplinary history, which included two prior incidents of inappropriately using the company telephone. [KCS Ex. A35]. Declaring Brown's misconduct "cannot be tolerated," Morse affirmed her suspension and concluded that her discipline was not excessive. *Id.* The union then appealed Brown's suspension to the Special Board of Adjustment ("Special Board"), which is comprised of an "employee member," a "carrier member," and a neutral chairman. The Special Board determined KCS was justified in punishing Brown more harshly than Taylor due to her prior disciplinary history, and that the 30-day suspension was "neither arbitrary nor unreasonable." [KCS Ex. A36].

On December 11, 2003, while Brown's appeal was pending, she filed a Charge of Discrimination with the EEOC alleging race and sex discrimination. On January 5, 2004, after being postponed five times, a formal hearing was held to investigate Brown's personal phone calls with Gloria Marshall. Tom Hadel, the investigating officer, determined Brown violated various KCS Responsibilities Rules while engaging in these personal phone calls. [KCS Ex. A37]. Consequently, KCS discharged Brown effective January 15, 2004. *Id.*

Brown and her union representative again appealed KCS's employment decision to John

---

[11]Brown complained Sharon Scott, Bill Coleman and Michelle Holmes also violated KCS rules but were not disciplined. [KCS Ex. A33]. Both Coleman and Holmes are African American.

Morse, who reviewed the evidence and denied her appeal. Brown then appealed to the Special Board who reviewed tapes of conversations between Brown and Marshall in which unanswered phones can be heard ringing in the background and Brown remarking, "them folks don't want nothing." [KCS Ex. A38]. The Special Board found Brown's conduct was "a blatant disregard" of her duties and concluded that her termination was "neither arbitrary nor capricious." *Id.*

**F.     Motion for Summary Judgment**

In filing a complaint of discrimination and retaliation under Title VII, the EEOC claims KCS is liable because the individuals responsible for making the initial employment decisions at issue, J.R. Thornell ("Thornell")[12] and Mark Redd ("Redd"),[13] harbored a discriminatory animus towards black employees and subjected them to harsher disciplinary actions than white employees. KCS seeks summary judgment on the ground that the EEOC cannot make out a prima facie case of discrimination or retaliation, nor can they establish a causal connection between any purported discriminatory or retaliatory behavior and the disciplinary actions they challenge. Further, KCS argues that even if Plaintiffs can establish a prima facie case of discrimination and/or retaliation, there is no evidence of pretext with which they can rebut KCS's legitimate, nondiscriminatory and nonretaliatory reasons for the challenged disciplinary actions. [Rec. Doc. 157].

**II.     SUMMARY JUDGMENT STANDARD**

Summary judgment "should be rendered if the pleadings, the discovery and disclosure

---

[12]T.R. Thornell made the adverse employment decisions concerning Turner, Frank, Thomas, and Cargo.

[13]Mark Redd made the adverse employment decisions concerning Brown.

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). A fact is "material" if it can "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court must "review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mutual Auto Insurance Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

The party moving for summary judgment bears the burden of informing the court "of the basis for its motion, and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309 (5th Cir. 1999). The moving party need not produce evidence to negate the elements of the non-moving party's case, but need only point out the absence of evidence supporting the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325; *Lawrence*, 163 F.3d at 311.

Once the moving party carries its initial burden, the burden then falls upon the non-moving party to demonstrate the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 250; 106 S.Ct. at 2511. The nonmovant "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (citations omitted). After reviewing the motions and supporting evidence, the court may grant summary judgment only if it is "satisfied that no reasonable trier of fact could find for the nonmoving party." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990).

## III. MOTION TO EXCLUDE OR LIMIT CONSIDERATION OF SUMMARY JUDGMENT EXHIBITS

"As a general rule, the admissibility of evidence on a motion for summary judgment is subject to the same rules that govern the admissibility of evidence at trial." *Id.* at 175-76. The EEOC filed a motion to exclude or limit consideration of certain exhibits filed by KCS arguing that many of KCS's exhibits are irrelevant or unduly prejudicial,[14] lack authentication, are hearsay, or are otherwise inadmissible under the Federal Rules of Evidence[15] and thus cannot properly support the motion for summary judgment. [Rec. Doc. 221].

### A. Lack of Foundation

The EEOC contends there is no foundation to support items 4-6 or 10-15 of Kathleen Alexander's affidavit [Ex. A] because there is no evidence to show she has personal knowledge or that she is competent to attest to such items. [Rec. Doc. 221]. With respect to items 4-5 and 10-15 of the affidavit, the EEOC ignores the fact that Kathleen Alexander is Director of Labor Relations with KCS and has extensive knowledge of the grievance and disciplinary procedures afforded KCS employees. However, with respect to item 6,[16] the Court does agree that while Alexander has extensive knowledge of the disciplinary process, she has no personal knowledge as to the documents actually reviewed by Thornell prior to making the employment decisions at

---

[14]All of the exhibits submitted by KCS are highly relevant to the employment decisions at issue. Further, none of the exhibits are overly prejudicial.

[15]The EEOC objects to several exhibits as being "self-disproving." However, the Court is unaware of any rule of evidence that would render the documents inadmissible on this basis.

[16]Item 6 provides: "In his role as decision-maker, Thornell would review the transcript, seek assessments from the investigative hearing officer, Labor Relations personnel, or other individuals, and review the employee's prior disciplinary history." [KCS Ex. A].

issue. Accordingly, item 6 of Alexander's affidavit will not be considered in evaluating KCS's motion for summary judgment.

The EEOC also claims Richard Venditti's affidavit [Ex. B] should also be excluded because there is no foundation to show he has personal knowledge or is competent to attest to the matters asserted in the affidavit. Once again, the EEOC ignores the fact that Richard Venditti is the Director of Human Resources and has access to the personnel records of all employees. All of the statements attested to by Venditti are matters with which he has personal knowledge and may be considered by the Court.

**B.     Lack of Authentication**

The EEOC objects to Exhibits A1, 3-7, 12-14, 20, 23-24, 32, 34 on the basis that these documents have not been authenticated. Nevertheless, Alexander's affidavit [Ex. A] is sufficient to authenticate the challenged exhibits. Pursuant to Federal Rule of Evidence 901, a document may be authenticated through the testimony of a witness with knowledge that the matter is what its proponent claims it to be. Fed. R. Evid. 901(b)(1). As stated above, Alexander is the Director of Labor Relations. In that position, she is the custodian of the records contained in the Plaintiffs' Labor Relations files and is competent to testify as to the authenticity of the documents contained in those files.[17]

**C.     Hearsay**

The EEOC objects to Exhibits A2-9, 12-17, 19-21, 23-27, 29-32, 34-35, 37, 39, 41-21, and B as being inadmissible hearsay offered for the truth of the matter asserted. [Rec. Doc. 221].

---

[17]With respect to Ex. A1, Alexander testified in her deposition that these guidelines were in effect prior to 2005. [EEOC Ex. 38, p.86-87].

Yet, the Court finds all of these exhibits qualify as admissible hearsay pursuant to Rule 803(6) of the Federal Rules of Evidence. Rule 803(6), also known as the "business records" exception, provides:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with 902(11), Rule 902(12), or a statute permitted certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Further, even if these documents were not admissible under the business records exception, the discipline letters [Exs. A2, 5, 12, 19, 25, 29, 41-41], transcripts from the investigative hearings [Exs. A3, 13, 24, 30, 32],[18] disciplinary records [Exs. A4, 14, 20, 23, 34], letters denying Plaintiffs' appeals [Exs. A7-8, 16-17, 26-27], and reinstatement letters [Exs. A9, 15, 21] are not being offered "for the truth of the matters asserted therein" and therefore are not "hearsay" under Rule 801. Rather, these documents are admissible to demonstrate the multiple levels of review afforded to each Plaintiff and the information available to the decision-makers at the time the adverse employment decisions were made.

### 4.     Arbitration Decisions

The EEOC also objects to Exhibits A10-11, 18, 28, 36, 38 (the decisions of the Public Law Board, NRAB, and Special Board) as being inadmissible hearsay. [Rec. Doc. 221].

---

[18]The EEOC argues the transcripts from the investigative hearings are inadmissible as KCS submitted incomplete copies of the transcript. Nevertheless, this argument is moot as the EEOC provided the complete transcripts of the investigative hearings with its Motion for Partial Summary Judgment [Rec. Doc. 172] which are admissible and may be considered by the court.

However, the arbitral boards are public agencies charged with handling employment disputed under the Railroad Labor Act ("RLA") and their opinions are reports of "matters observed pursuant to duty imposed by law as to which matters there was a duty to report." Fed. R. Evid. 803(8)(B). Thus, their findings are admissible pursuant to the "public records" exception set forth in Rule 803(8).[19]

Additionally, the EEOC objects that these documents are inadmissible because they are irrelevant and unduly prejudicial. [Rec. Doc. 221]. But the Supreme Court has repeatedly found that the railroad arbitration process provides a reliable process and a suitable forum for disputes between railroad employees and employers. *See e.g., Slocum v. Delaware, L & W.R. Co.*, 339 U.S. 239, 243, 70 S.Ct. 577, 579 (1950) (A railroad arbitration board is "well-equipped to exercise its congressionally imposed functions. Its members understand railroad problems and speak the railroad jargon. Long and varied experiences have added to the Board's initial qualifications."); *Order of Ry. Conductors of America v. Pitney*, 326 U.S. 561, 567, 66 S.Ct. 322, 325 (1946) (the NRAB is "especially competent" to deal with the intricate and technical issues that arise in the specialized area). Accordingly, the decisions rendered by the Public Law Board, NRAB, and Special Board shall be considered by this Court in evaluating KCS's motion for summary judgment. *See Graef v. Chem. Leaman Corp.*, 106 F.3d 112, 117 (5th Cir. 1997) (arbitral decisions can be "highly probative" to the issue of whether an adverse employment action was taken for legitimate reasons); *Baker v. Union Pac. RR Co.*, 145 F. Supp. 2d 837, 843 (S.D.Tex. 2001) (the district court found the arbitral decision was "plainly relevant" to the issue

---

[19]Rule 803(8) provides, in pertinent part, that the following is not excluded by the hearsay rule: "Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the agency, or (B) matters observed pursuant to a duty imposed by law as to which matters there was a duty to report..."

of pretext "because it supports the validity of Defendant's articulated nondiscriminatory reason for its employment decision").

## IV.    LAW AND ANALYSIS

Title VII prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2(a). A plaintiff may prove employment discrimination through direct or circumstantial evidence. *See Laxton v. Gap Inc.*, 333 F.3d 573, 578 (5th Cir. 2003). When there is no direct evidence of discrimination, as in this case, a plaintiff's claims are evaluated using the evidentiary framework set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973). Under the *McDonnell Douglas* framework, in order to survive a motion for summary judgment, the plaintiff must first establish a *prima facie* case of discrimination by a preponderance of the evidence. *Id.* at 802, 93 S.Ct. at 1824. Once established, the *prima facie* case raises a presumption of discrimination, which the defendant must rebut by articulating a legitimate, nondiscriminatory reason for its actions. *Meinecke v. H&R Block,* 66 F.3d 77, 83 (5th Cir. 1995). If the defendant satisfies this burden, the plaintiff must prove the proffered reasons are pretextual. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093 (1981).

### 1.    *Prima Facie* Case

### A.    Discrimination Claims

When a plaintiff has been discharged or suspended from employment because he violated employment work rules, the plaintiff may establish a *prima facie* case of discrimination in one of two ways. *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980), *cert. denied*, 449 U.S. 879, 101 S.Ct. 227 (1980). First, the plaintiff may show by a preponderance of the evidence

that he did not violate the rule in question. *Id.* Second, if he did violate the work rule, he must show that he was treated less favorably than white employees who engaged in similar acts. *Id.* In making this showing, plaintiff must show that white employees were treated differently under "nearly identical" circumstances. *Randolph v. Terrebonne Parish Consol. Gov't*, 2003 WL 22836099, *7 (E.D.La. 2003) (citing *Little v. Republic Ref. Co., Ltd.*, 924 F.2d 93, 97 (5th Cir. 1991)). In other words, plaintiffs must "point to individuals who have dealt with the same supervisor, have been subject to the same standards, and engage in the same conduct without any mitigating or distinguishing circumstances." *See Smith v. United Parcel Serv.*, 2006 WL 733467, *6 (N.D.Cal. 2006) (quoting *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000)).

<u>Thomas Turner:</u>

Turner argues he did not violate the work rule for which he was allegedly fired, and even if he was at fault in the derailment, other employees committed more serious infractions but were punished less severely. [Rec. Doc. 172]. Turner's first argument is without merit. All evidence demonstrates that Turner violated KCS Operating Rules 2.13, 6.22, 6.28, 6.5, 7.1, 7.12, and 7.2 on October 1, 2002, in connection with the derailment of a KCS engine. [KCS Ex. A2-4, 7, 8, 10]. Turner was found to have violated these rules not only by Paul Lobello, the investigating officer, but also by T.R. Thornell, Denise Brame, Kathleen Alexander, and Public Law Board No. 6647. [KCS Ex. A7-8, 10].

Turner's second argument likewise fails. Turner had a significant disciplinary history which revealed a 1974 drug test showing the presence of long-lasting barbiturates, a written reprimand for deficient train inspections in 1982, a suspension for a failed brake test in 1988, and a "last chance" reinstatement following his dismissal due to a failed drug and alcohol test in 1999. [KCS Exs. A4-6, 11]. Although Turner points to Thomas Schmitt, Frank Mouney, and

Joshua Hall to demonstrate white employees were treated more favorably, these individuals were not disciplined under "nearly identical" circumstances.

Thomas Schmitt was not disciplined in connection with the October 1, 2002 derailment because, following the investigation, he was determined not to be at fault for the derailment. Even if he had been found to be at fault, Schmitt's prior disciplinary history[20] did not compare to Turner's and would not have justified a discharge. [EEOC Exs. 31-32].

Frank Mouney, a white engineer, received a 45 day actual suspension, 45 day deferred suspension, 5 days of remedial training, and had his engineering certification revoked for 30 days in connection with a sideswipe incident that occurred on October 30, 2002. Cargo argues he should have been terminated, but in the railroad industry, a sideswipe is not considered to be as serious as a derailment and does not require the same level of discipline as a derailment. [KCS Ex. A ¶ 12]. Further, Mouney's prior disciplinary actions were merely related to routine missed calls, which are not as serious as the drug and alcohol infractions previously committed by Turner. [Rec. Doc. 116, Ex. A42].

Joshua Hall, a white engineer, improperly ran past a "dark signal" in violation of safety rules on February 14, 2004. Hall was initially discharged, but was reinstated after serving a 30 day suspension. *See* Part I, C, *supra*. Unlike Turner, Hall had only four prior disciplinary actions, all of which were relatively minor[21] and resulted only in a letter of reprimand or 3-5 day

---

[20]Schmitt's prior disciplinary history merely included a letter of reprimand for extensive damage in 1999. [EEOC Ex. 31].

[21]On December 05, 2001, Hall was involved in a derailment that occurred on the south end of Baton Rouge Yard for which he received a written reprimand. Although a derailment is considered to be a serious incident, at the time of this incident, Hall was serving as the engine foreman and was not operating the locomotive. [Rec. Doc. 116, Ex. 65].

suspension. [Rec. Doc. 116, Ex. A52].

<u>Jesse Frank</u>:

Jesse Frank contends he did not violate the work rule regarding "missed calls." However, his conclusory allegation that he did not violate KCS work rules is insufficient to establish a *prima facie* case. The transcript of the phone call between Frank and the crew dispatcher clearly shows that Frank knew he was scheduled to be at work, but nonetheless informed the crew dispatcher that he would not be available. [EEOC Ex. 6]. Further, KCS General Operating Rule 1.16 provides: "Employees subject to call must indicate where they can be reached... and must not be absent from their calling place without notifying those required to call them." *Id.*, p.54. Frank admitted to the crew dispatcher that he was in Mississippi, more than three hours away, when he called to request time off and was thus in violation of Rule 1.16.

Frank also argues that Frank Mouney and David Stockinger were treated more favorably. Although Mouney missed more calls than Frank, he was punished much less harshly.[22] However, Frank's 90 day suspension was not assessed merely for his "missed call." Rather, the assessed discipline was also based on his insubordination and dishonesty (in violation of Rule 1.6) and engaging in misconduct that adversely affected the interest of the company (in violation of System Timetable Rule No. 5, Rule 1.6). [KCS Ex. A12].

David Stockinger, who called the crew dispatcher to request time off only one minute after Frank, was permitted to mark off for his shift which began immediately after Frank's shift. [KCS Ex. C]. Although Frank claims this is evidence of a white employee being treated "more favorably," Frank's argument fails because Stockinger was not marked off under "nearly

---

[22]In connection with his missed calls, Mouney received numerous reprimands and received several 3-7 day suspensions. [Rec. Doc. 116, Ex. A-42].

Page 19

identical" circumstances. Frank called less than six hours before his shift, and at that time the crew dispatcher had no information as to whether he had been approved for the time off or whether there was anyone available to replace him. [KCS Ex. D]. On the other hand, Stockinger called 14 hours before his shift was scheduled to start, and the crew dispatcher had information on hand indicating there were available replacements for that shift. *Id.* This discrepancy is significant because locomotive engineers work in shifts and KSC requires the engineers be rested for a certain number of hours before they can be requested to work again. [KCS Ex. A]. The employees available to fill Stockinger's position were not available for Frank's position because they would not have been "rested" long enough.

Lester Thomas:

Lester Thomas claims he did not violate any work rules in connection with the February 14, 2004 ("dark signal") incident; rather, he asserts Joshua Hall was entirely at fault for the incident. Yet, KCS conducted a formal investigation and determined that both Thomas and Hall were at fault in the incident. [KCS Exs. A19, 41]. The EEOC's mere assertion that Thomas was not at fault, unsupported by evidence, is not sufficient to establish a prima facie case.[23]

Furthermore, Thomas cannot demonstrate that Hall was similarly situated. At the time of the incident, Thomas had eight prior disciplinary actions on his record, five of which occurred in the previous two years. [KCS Ex. A20]. In comparison, Hall had only four prior disciplinary actions, all of which were relatively minor. *See,* Part I, C, *supra.* Thus, the circumstances under

---

[23]The EEOC argues that operational (or "efficiency") testing may only be used for education purposes and that it violated KCS policy to discipline Thomas for the incident. However, the EEOC's own exhibit directly contradicts the EEOC's assertion. KCS's Program of Operational Testing clearly states that is used "secondarily as a disciplinary process" and that "[i]n some instances discipline is federally mandated." [EEOC Ex. 19]

which discipline was assessed for each individual were not "nearly identical" and did not require the same degree of punishment for each individual.[24] *See Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991).

Clarence Cargo:

With respect to the suspension for failing to fax a work order, Clarence Cargo asserts Dale Laurendine and Brock Fultz were similarly situated but were treated more favorably. The EEOC asserts that Laurendine merely received a reprimand for failing to fax a work order while Cargo received a 45 day suspension. But the EEOC fails to acknowledge that Cargo only received a 30 day suspension with respect to the May 1, 2003 incident. This suspension was increased to 45 days because the 15 day deferred suspension he previously received on January 30, 2003 was activated and added to the suspension he received for the incident itself. [KCS Ex. A23]. Moreover, Laurendine had never been investigated or disciplined for failing to fax a work order, while Cargo had two prior violations for failing to fax a work order. *Id.* Laurendine and Cargo were both disciplined in accordance with KCS Guidelines, which mandates a letter of reprimand for the first violation, up to 30 days deferred suspension for the second violation, and up to 90 days actual suspension for the third violation. [KCS Ex. A1].

Similarly, Cargo cannot demonstrate that Brock Fultz was "similarly situated." As discussed above, Cargo was disciplined in accordance with KCS guidelines. Furthermore, the EEOC does not point to any evidence indicating that Fultz actually failed to file a work order[25] or

---

[24]As an additional indication that Hall was not treated more favorably than Thomas, KCS terminated Hall's employment in January 2006 after he ran through a switch and caused track damage in October 2005. [Rec. Doc. 157].

[25]An investigation was commenced to determine whether Fultz failed to fax a work order, but the investigation was later canceled.

that Fultz had a similar disciplinary history.

With respect to Cargo's discharge in connection with the January 7, 2004 switch incident, Cargo contends Scott Claiborne was solely at fault, or at least more at fault than Cargo. After the incident, a formal investigation was held to determine each man's fault for the infraction. [Rec. Doc 172, Ex. 33]. Ed Laughlin, the investigating officer, T.R. Thornell, Denise Brame, Kathleen Alexander and the NRAB all concluded that Cargo was at fault in the switch incident. [KCS Exs. A25–28]. In fact, the NRAB expressly rejected Cargo's assertion that Claiborne was solely to blame, noting that "it is apparent from the record that the engineer [Claiborne] was not in a position to see the switch" and relied to his detriment "solely on the experience of Claimant to evaluate the situation correctly and safely." [KCS Ex. A28, p.5]. Further, Brame and Alexander evaluated Cargo's prior disciplinary history, which included 16 prior disciplinary actions, and concluded the discipline was fully warranted. [KCS Exs. A26–27]. Although the NRAB chose to reinstate Cargo, they did "not entirely disagree with the penalty assessed" and rejected Cargo's claim that the discipline assessed was discriminatory or unreasonable. [KCS Ex. A28, p.5].

Roberta Brown:

With respect to her 30 day suspension for falsely marking off Reggie Taylor as sick, Roberta Brown claims there is no evidence that she committed an infraction in this circumstance. [Rec. Doc. 198]. She points to the deposition of Joe McDonald wherein McDonald testified that he did not ask Brown whether she honestly believed Taylor was sick. [EEOC Ex. 47, p. 120]. Nevertheless, after reviewing the transcript of the phone call between Brown and Taylor, the Court finds such an inquiry was unnecessary. When Taylor called to "mark off for in the morning," he initially stated that he guessed he would have to mark himself off as being sick. [EEOC Ex. 11, p.6]. But as the conversation continued, Taylor told Brown:

| Taylor: | Seriously, no, seriously _____ so I can get up in the morning get my vehicles certified and then I'll —. |
| Brown: | So, you're getting your cars inspected. |
| Taylor: | Yes, mam. |
| Brown: | Ok, I got you covered. |

*Id.,* p.9. The transcript clearly reveals Brown knew Taylor was marking off so he could run

personal errands, not because he was sick.[26]

Brown objects that even if she were at fault, she should not have been punished more

severely than Taylor. But as the Special Board pointed out, Brown's prior discipline justified the

discrepancy. [KCS Ex. A36]. In 1998, Brown received a 1-day and 3-day suspension; in 2002

she received a 10-day suspension together with a 5-day record suspension and 6 month

probationary period; and in 2003 she received a letter of reprimand. *Id.* The 2002 and 2003

disciplines were imposed for violations relating to misuse of the telephones, demonstrating she

repeatedly engaged in this type of misconduct. *Id.* As a result, Taylor and Brown were not

"similarly situated" and KCS was not required to assess the same discipline for each individual.

Brown points to Sharon Scott and Kevin Kavanaugh to demonstrate other employees who

were treated more favorably under "nearly identical" circumstances. [Rec. Doc. 198]. Sharon

Scott received a 10 day deferred suspension for marking off a conductor as sick. However, after

an investigative hearing was held, KCS determined Scott was rushed and made a mistake. In

comparison, Brown's conversation occurred on the wrong telephone line, lasted significantly

---

[26]Additionally, the transcript shows the parties engaged in flirtation throughout the
conversation and that Taylor made numerous attempts to ask Brown on a date. At no time did
Taylor indicate that he was sick, nor did Brown indicate that she believed him to be sick. [EEOC
Ex. 11].

longer than needed, and was not entirely work related.[27][EEOC Ex. 11]. She knew Taylor was merely taking off to have his cars inspected, but nevertheless chose to falsely mark him off as being sick. Furthermore, unlike Brown, Scott did not have a prior disciplinary history showing rule violations related to telephone misuse.

With respect to Kevin Kavanaugh, there is no evidence in the record that he was disciplined or even investigated for falsely marking off an employee. On November 7, 2003, Kavanaugh received a written reprimand in connection with failing to properly perform his duties in violation of KCS Operating Rule 1.13 (failure to properly perform duties). Prior to November 7, 2003, he had been subject to only two disciplinary actions, neither of which involved dishonesty or telephone misuse. In contrast, Brown violated KCS Operating Rules 1.6 (dishonesty) and 1.16 (general responsibilities) and had a history of engaging in similar conduct. [Rec. Doc 157, Exs. A34, 39]. Consequently, neither Scott nor Kavanaugh were proper comparators because they were not disciplined under "nearly identical" circumstances.

With respect to her discharge for improper personal phone calls with co-employee Gloria Marshall, Brown argues she was discriminated against because she received a harsher punishment than Marshall. Brown's argument ignores the simple fact that Marshall was not on duty at the time the phone calls took place and, consequently, was under no obligation to answer the incoming calls and perform job duties in the call center. On the other hand, Brown was at work during these phone conversations and had been placed on notice, by a directive issued to the office and through prior discipline, that personal phone conversations on business phones were not allowed and that crew dispatchers must devote themselves to their duties. [KCS Ex.

---

[27]*See, e.g.,* n.26.

A38]. While listening to tapes of these conversations, phones can be heard ringing in the background and Brown can be heard to remark, "them folks don't want nothing," [EEOC Ex. 11], conduct which the Special Board found to be in "blatant disregard" of her duties. [KCS Ex. A38]. Thus, based on the severity of her misconduct, KCS was justified in assessing a harsher discipline for Brown than the one assessed for Marshall.

## B. Retaliation Claims

To establish a *prima facie* case of retaliation, a plaintiff must prove (1) he engaged in a protected activity, (2) he suffered an adverse employment decision, and (3) a causal connection between the protected act and the adverse action. *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999). Ultimately, the plaintiff must show that "but for" the protected activity, the adverse employment action would not have occurred." *Id.*

Clarence Cargo and Roberta Brown both assert they were disciplined in retaliation for complaining of the disparate treatment of blacks in their workplace. It is undisputed that both Cargo and Brown engaged in a protected activity and that they suffered adverse employment actions. *See*, Part I, D-E, *supra*. The EEOC argues a causal connection is presumed because of the temporal proximity of their participation in the protected activity and the discipline assessed. However, temporal proximity alone is insufficient to establish a causal connection. *Strong v. Univ. Healthcare Sys., LLC,* 482 F.3d 802, 807 (5th Cir. 2007); *Roberson v. Alltel Inform. Serv.,* 373 F.3d 647, 656 (5th Cir. 2004) ("without more than timing allegations...summary judgment in favor [of the defendant] was proper"). The Supreme Court has made it clear that temporal proximity will be sufficient evidence of a causal connection only when the temporal proximity between the protected acts and the adverse employment action is "very close." *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 1511 (2001); *see, e.g., Shackelford*

*v. Deloitte & Touche, LLP*, 190 F.3d 398 (5th Cir. 1999) (plaintiff was fired within one week of being named as a potential witness in a lawsuit against her employer and on the same day her supervisor overheard her speaking on the phone with counsel).

In this case, Cargo was suspended on May 28, 2003, nearly two months after he filed his first Charge of Discrimination with the EEOC on April 2, 2003. [EEOC Ex. 61]. Brown was suspended on November 26, 2003, nearly one month after she wrote a letter to Rich Venditti, Director of Human Resources, complaining of "favoritism" among the crew dispatchers, and more than two months after she "complained to the manager and the director that black employees are treated poorly by management in terms of discipline." [KCS Ex. A33; Brown Ex. 7]. Similarly, Brown's termination on January 15, 2004 did not occur until one month after KCS received notice of Brown's EEOC charge on December 18, 2003.[28] [Brown Ex. 15]. Without more, these time lapses are insufficient to establish a "causal connection" that would enable Cargo and Brown to satisfy the third prong of the prima facie case. *See McDowell v. Home Depot USA, Inc.*, 126 Fed.Appx. 168 (5th Cir. 2005) (one day period between employee's participation in a protected activity and her demotion was insufficient to establish a causal link); *Myers v. Crestone Intern., LLC*, 121 Fed.Appx. 25 (5th Cir. 2005) (evidence that plaintiff was terminated three months after she complained of discrimination was insufficient to establish a causal connection); *Seaman v. CSPH, Inc.*, 179 F.3d 297 (5th Cir. 1999) (although plaintiff was fired moments after he informed his supervisor that he filed a Charge of Discrimination with the EEOC, he failed to establish a causal connection between the protected activity and his

---

[28]Brown's investigative hearing was originally scheduled for November 6, 2003, more than one month before KCS received notice of the Charge of Discrimination. The hearing was postponed five times at the request of Brown's union representative. [KCS Ex. A-32].

termination).[29]

## C. EEOC's Argument

As discussed above, none of the Plaintiffs are unable to establish a *prima facie* case of discrimination because they cannot demonstrate by a preponderance of the evidence that they did not commit the alleged infractions, nor can they point to other employees, who are outside of the protected class, who were treated more favorably under "nearly identical" circumstances. Similarly, Cargo and Brown cannot establish a *prima facie* case of retaliation because there is no causal connection between their participation in protected activities and the challenged employment actions. Even so, the EEOC claims the *prima facie* case is irrelevant where the employer offers a rationale for the challenged employment action. [Rec. Doc. 197]. The EEOC points to *Olitsky v. Spencer Gifts, Inc.*, 964 F.2d 1471 (5th Cir. 1992), where the Fifth Circuit stated:

> When the defendant has produced evidence of a nondiscriminatory reason for plaintiff's discharge, and plaintiff has had an opportunity to challenge that reason as pretextual, the trier of fact should proceed directly to the ultimate issue of whether the defendant intentionally discriminated against the plaintiff. The initial prima facie case is no longer relevant.

*Id.* at 1478 (citing *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478 (1983).

*Olitsky* is distinguishable from the case at bar because all issues were fully tried on the merits and submitted to the jury. On appeal, the Fifth Circuit merely held that it is unnecessary

---

[29]The Court also finds Cargo and Brown are unable to establish a claim for retaliation because they cannot show that "but for" the protected activity, they would not have been disciplined. *See Seaman*, 179 F.3d at 301, *supra*. The independent internal investigative hearing, two levels of review by Labor Relations personnel, and the independent review by an outside arbitrator is sufficient to sever the causal link between any alleged retaliatory animus and the adverse employment actions. *See* Part IV, C, *infra*.

to include the elements of a *prima facie* case in the jury instructions <u>*after*</u> the trial court determines that the plaintiff has established a *prima facie* case and the defendant has set forth a legitimate, nondiscriminatory reason for its actions. *Id.* (underline added). Moreover, the Supreme Court clearly stated in *Aikens* that the analysis advanced by the EEOC is warranted only "when the defendant fails to persuade the district court to dismiss the action for lack of a *prima facie* case." *Aikens*, 460 U.S. at 714; 103 S.Ct. at 1481 (noting that the district court denied defendant's motion to dismiss after concluding plaintiff had made out a prima facie case).

The EEOC cannot evade its burden to establish a prima facie case simply because KCS asserted reasons for the challenged employment actions.[30] Nevertheless, in an abundance of caution, the Court will proceed to the next step of the *McDonnell-Douglas* analysis for both the discrimination and retaliation claims.

### 2. Legitimate, Nondiscriminatory Reasons

KCS's reasons for the challenged disciplinary actions (work rule violations) have been stated in detail above. In each instance, the Plaintiff committed an infraction of KCS policies. Following each infraction, the employee was given an opportunity to testify at an independent investigative hearing or to waive such a hearing and accept responsibility. J.R. Thornell and Mark Redd evaluated the circumstances of the work rule violations and assessed discipline. The

---

[30]The requirement of a showing by the plaintiff of a *prima facie* case is firmly established by United States Supreme Court precedent and this standard continues to be applied by all of the Circuit Court of Appeals except for the District of Columbia. *See Lewis v. Heartland Inns of America, L.L.C.*, 585 F.Supp.2d 1046, 1062 (S.D. Iowa, 2008); *see also, Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187 (10th Cir. 2008) (Tenth Circuit expressly standard applied by the D.C. Circuit in *Brady v. Office of the Sergeant of Arms*, 520 F.3d 490 (D.C. Cir. 2008)).

employment decisions concerning Plaintiffs Turner, Frank, Cargo, and Brown[31] were then reviewed by Denise Brame and either Kathleen Alexander or John Morse, who determined each Plaintiff was responsible for the rule violations and affirmed the disciplinary decisions of Thornell and Redd. KCS maintains that the discipline was not imposed to discriminate against Plaintiffs, but, rather, was necessary given the nature of the infraction, the Plaintiff's prior disciplinary record, and KCS disciplinary guidelines. [Rec. Doc. 157].

### 3. Pretext

The plaintiff bears the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff. *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093 (1981). To carry this burden, once the employer articulates a legitimate, nondiscriminatory reason for the challenged employment action, the plaintiff must produce substantial evidence of pretext. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001). The plaintiff must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates. *Id.*; *see also, Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1007 (7th Cir. 2001) (a plaintiff "must present facts to rebut each and every legitimate non-discriminatory reason advanced by [the employer] in order to survive summary judgment."). Simply disputing KCS's reasons will not support an inference of pretext. *Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 408 (5th Cir. 1999). Rather, the Plaintiffs must establish pretext through "evidence of disparate treatment" or by showing that KCS's proffered explanation is "unworthy of credence." *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).

As discussed above, there is no evidence of disparate treatment to support Plaintiffs'

---

[31]Lester Thomas also appealed his discharge, but KCS offered him a leniency reinstatement before the decision could be reviewed.

claims. *See*, Part IV.1.A, *supra*. Plaintiffs are unable to identify any employees who are not

members of the protected class that were treated more favorably under "nearly identical"

circumstances. *See Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991).

Additionally, Plaintiffs cannot demonstrate that KCS's explanations for the challenged

disciplinary actions are false or "unworthy of credence." An explanation is false or "unworthy of

credence" if it is not the real reason for the adverse employment action. *Laxton,*333 F.3d at 578,

citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002). Each of the

disciplinary decisions concerning Turner, Frank, Cargo and Brown were reviewed by neutral and

independent arbitrators who considered all the evidence, arguments and submissions made by the

Plaintiffs and KCS, and concluded that these Plaintiffs engaged in misconduct and violated KCS

rules/policies. [KCS Exs. A10, 18, 28, 36, 38]. The findings of the Public Law Board, NRAB,

and Special Board strongly support the validity of KCS's explanations for the decisions to

suspend and/or discharge Plaintiffs' from employment. *See Baker v. Union Pac. RR. Co.*, 145

F.Supp.2d 837, 843 (S.D.Tex. 2001); *see also, Jennings v. Ill. Dept. of Corrections,* 496 F.3d

764 (7th Cir. 2007) (district court properly granted summary judgment where independent

investigator and independent arbitrator separately reached the conclusion that [plaintiff] had

engaged in the prohibited conduct); *Timm v. Illinois Dept. of Corrections*, 2007 WL 2994111, *7

(C.D.Ill. 2007) (the fact that an independent arbitrator reviewed the evidence and upheld the

employee's discharge on appeal suggests the employer's stated reasons were not pretextual);

*Serling v. American Airlines, Inc.*, 2006 WL 1140649 (N.D.Tex. 2006) (district court's

conclusion that plaintiff failed to demonstrate pretext was supported by the fact that an

arbitration panel independently upheld plaintiff's dismissal).

The EEOC argues KCS's articulated legitimate, nondiscriminatory reasons should be

disregarded because Thornell cannot recall whether he reviewed the investigative hearing transcripts or the disciplinary records of the Plaintiffs' prior disciplinary history, or recall why he took the challenged actions.[32] [Thornell depo. p 25-26]. They claim Thornell and Redd were the sole decision-makers with respect to the challenged employment actions, therefore the Court must focus only on their alleged discriminatory intent.[33] But the record clearly demonstrates that Thornell and Redd were *not* the sole decisions-makers. To the contrary, a formal investigative hearing was held by an investigating officer prior to Thornell and Redd assessing discipline. These investigating officers were also responsible for determining whether the evidence adduced at the investigative hearing proved the violations charged. [Thornell depo. at 70; Laughlin depo. at 78-79, 82; Lobello depo. at 45]. Once the disciplinary decisions were made, the disciplinary decisions were reviewed on two levels in the Labor Relations Department. [Thornell depo. at 96; Rec. Doc. 157 Exs. A7-8, 16-17, 26-27, 35]. Thus, it is apparent that the challenged employment decisions were not made solely by Thornell or Redd; rather, these decisions received multiple levels of independent review.

Even if Thornell and Redd were the sole decision-makers with respect to the challenged employment actions, the unsupported and conclusory allegations of pretext proffered by the EEOC are insufficient to rebut the legitimate, nondiscriminatory and nonretaliatory reasons set

---

[32]Although Thornell stated he could not remember making the employment decisions at issue, Mark Redd specifically state that he looked at the investigative hearing transcript and Brown's disciplinary history prior to assessing discipline. [EEOC Ex. 48, p.203-205].

[33]As discussed below, the EEOC makes numerous allegations with regard to the discriminatory intent of Thornell and Redd, but fails to provide support for these allegations. *See, infra.* Even if the Court were to find sufficient evidence of a discriminatory animus by Thornell and/or Redd, there is no evidence that they exerted any influence over the decisions of the investigating officers, Labor Relations personnel, or arbitral boards.

forth by KCS. For example, the EEOC states: "Defendant's blatant and persistent misrepresentations about who made the challenged employment decisions are evidence of pretext, discrimination, and mendacity," (p.14), "Disciplinary histories were not actually considered," (p. 21), "*Post hac* rationales are evidence of pretext and discrimination," (p.22), and "Defendant's stated reasons for its employment actions have been inconsistent and have shifted over time" (p.28). Yet, the EEOC fails to provide <u>any</u> citations or references to the record in order to support these allegations. After stating that there "are several examples of direct evidence of discriminatory animus in this case," the EEOC "respectfully refers the Court to the full text of all the Charging Parties and KCS officials' depositions in the summary judgment record." [Rec. Doc. 197, p.24-25]. Such unsupported and conclusory allegations are insufficient to rebut the legitimate, nondiscriminatory and nonretaliatory reasons set forth by KCS and establish pretext.[34]

The Court takes notice that the EEOC submitted 81 exhibits in connection with its Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Summary Judgment, including 16 voluminous depositions and thousands of pages which were obtained through discovery. But, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.1998); *Forsyth v. Barr*, 19 F.3d 1527,

---

[34]Although the EEOC does refer to a few statements which they contend are evidence of discrimination, [Rec. Doc. 197, p.23-24], the self-serving statements of Plaintiffs and the testimony of others who lack personal knowledge of the disputed facts are insufficient to raise an issue of material fact on the issue of pretext. *See Brummitt v. Innovex America Holding Co.*, 113 Fed.Appx. 597, 599 (5th Cir. 2004); *see also, Brown v. City of Tuscan*, 336 F.3d 1181, 1187 (9th Cir. 2003) ("circumstantial evidence of pretext must be specific and substantial in order to survive summary judgment.").

1537 (5th Cir.1994), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994); *see also*

*Nissho-Iwai American Corp. v. Kline,* 845 F.2d 1300, 1307 (5th Cir.1988) (it is not necessary

"that the entire record in the case ... be searched and found bereft of a genuine issue of material

fact before summary judgment may be properly entered"); *cf. U.S. v. Dunkel,* 927 F.2d 955, 956

(7th Cir.1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). When evidence

exists in the summary judgment record but the nonmovant fails even to refer to it in the response

to the motion for summary judgment, that evidence is not properly before the district court. *See*

*Ragas,* 136 F.3d at 458 (5th Cir.1998). While the Court acknowledges that there may be

evidence of pretext buried within the record, that evidence is not properly before the court.

Accordingly, Plaintiffs are unable to rebut the legitimate, nondiscriminatory and nonretaliatory

reasons articulated by KCS and provide substantial evidence of pretext. *See Wallace, supra,* 271

F.3d at 219.

## V.    CONCLUSION

The Court finds Plaintiffs are unable to establish a *prima facie* case of discrimination

and/or retaliation in violation of Title VII. Furthermore, even if Plaintiffs were able to establish a

*prima facie* case, they are unable to rebut the legitimate, nondiscriminatory and nonretaliatory

reasons articulated by KCS for each of the disciplinary actions at issue.

Therefore, **IT IS ORDERED** that KCS's Motion for Summary Judgment be and is

hereby **GRANTED.** All claims against KCS are hereby **DISMISSED WITH PREJUDICE.**

**THUS DONE AND SIGNED** this ___*19*___ day of May, 2009.

DONALD E. WALTER
UNITED STATES DISTRICT JUDGE